778 So.2d 1100 (2001)
LONG TERM CARE FOUNDATION, INC., et al., Appellant,
v.
Winifred W. MARTIN, et al., Appellee.
No. 5D99-3540.
District Court of Appeal of Florida, Fifth District.
March 16, 2001.
*1101 Charles P. Schropp & Amy S. Farrior of Schropp, Buell & Elligett, P.A., Tampa, for Appellant.
Irwin J. Weiner of Weiner & Argo, P.A., Ocala, & Michael A. Smith, Dunnellon, for Appellee.
THOMPSON, C.J.
The Long Term Care Foundation, Inc. and Servicemaster Diversified Health Services, Limited Partnership (collectively "the center,") appeal a final judgment in favor of Winifred Martin and her husband, James Martin. We reverse because the court allowed into evidence inadmissable, highly prejudicial evidence.
The evidence at trial showed that after sustaining a broken hip, Winifred Martin was admitted to a hospital for surgery. While at the hospital she developed a sore on one of her toes. Her personal physician noticed the sore but did nothing to determine its etiology. She was released from the hospital and admitted to Citrus Health and Rehabilitation Center. Long Term owns the center and Servicemaster operates it. Neither the hospital nor Martin's physician relayed information about the sore, but a nurse at the center noticed it during Martin's initial medical assessment. The nurse checked "yes" for "circulatory" on Martin's Medicare Screening and Charting Guide. This required the nurses to monitor Martin's circulation daily by checking the warmth and color of her feet, and by taking the pedal pulse. During Martin's entire stay at the center, no nurse indicated on the chart that the pedal pulse had been checked.
From August 29, 1996, the day after she was admitted to the center, until September 1, 1996, the nursing notes indicate no complaints of pain by Martin. On September 3, a nurse called Martin's personal physician to set up a consultation with a podiatrist. The podiatrist saw Martin on September 7, and ordered x-rays, a culture, and a sensitivity study. The podiatrist thought the bone could be infected, and suggested to the personal physician that the latter prescribe an antibiotic. The podiatrist found pulses in both feet, but he also found distal cooling, which indicated insufficient blood flow. The podiatrist testified that he advised the personal physician to order a peripheral vascular study, a claim the personal physician denied. Ultimately, the tests ordered by the podiatrist proved negative for infection.
The nursing notes show administration of antibiotics through September 14, at *1102 which point Martin complained of pain. Two days later the toe began to turn green. On September 20, Martin complained of pain frequently. On September 22, the day after Martin reported that her toe had been run over by a wheelchair, the toe was black. On September 25, Martin complained of increased pain, and a nurse called the personal physician for authorization to set up a consultation with a foot surgeon. On September 28 the personal physician went to the center to see Martin. On October 1, the foot surgeon, who had been called on September 26, saw Martin, diagnosed gangrene, and concluded the toe should be amputated.
The foot surgeon referred Martin to a general surgeon, who saw Martin on October 3 and ordered a vascular lab study. The study, performed on October 10, revealed very bad circulation. According to the center's defense expert, this information should have been discovered in August. In addition, according to the expert, the general surgeon should have ordered an arteriogram to determine the condition of the arteries. Instead, the general surgeon concluded (incorrectly, according to the expert) that Martin had no pulse in the leg, so the entire leg had to be amputated. Martin's experts testified that if the nurses had monitored her pedal pulse they would have noticed a lack of pulse, and surgical intervention would have saved the leg. Martin's leg was amputated on October 18.
In support of a claim for punitive damages, Martin introduced a complaint against the center in another case. The complaint alleged in broad terms that the center breached its duty to: (a) develop, implement, and update an appropriate resident care plan; (b) maintain medical records containing enough information to justify the diagnosis and treatment, and to document the results, including at a minimum documented evidence of assessments of the needs of the resident, establishment of appropriate plans of care and treatment, and of the care and services provided; (c) protect the resident from mental and physical abuse within the facility; (d) properly prevent the resident from falling within the facility; (e) properly assess the resident's risk for falls; (f) protect the resident from foreseeable harm, including falling in the facility; (g) provide adequate hydration to he resident; (h) provide adequate and appropriate health care to the resident; (i) provide adequate and appropriate protective and support services to the resident; (j) properly supervise staff; (k) properly train staff; and (l) protect the dignity and privacy of the patient.
We agree with the center that the complaint should not have been admitted in evidence. Martin relies on Mitchell v. State, 491 So.2d 596 (Fla. 1st DCA 1986), in which the court affirmed convictions for aggravated abuse or exploitation of the elderly, and culpable negligence. The charges centered around the defendant's treatment of residents of his adult congregate living facility. Section 400.11, Florida Statutes (1981) made it a felony to "knowingly or willfully" abuse, neglect, exploit, or maltreat "an individual suffering from the infirmities of aging, and in so doing, cause[ ] great bodily harm, permanent disfigurement or permanent disability...."
The defendant claimed that the trial court erred in admitting evidence concerning mistreatment of residents other than those named in the information, and evidence of "a similar shoddy operation by [the defendant] in Iowa." In affirming, the district court pointed out that evidence of other crimes, wrongs and acts is admissible if it is probative of a material issue other than the bad character or propensity of an individual. Id. at 598 (citing Williams v. State, 110 So.2d 654 (Fla. 1959)). The so-called Williams rule states a general rule of admissibility of relevant evidence even though the evidence may indicate that the accused has committed other uncharged crimes, or may otherwise reflect adversely upon the accused's character. Id. Section 90.404(2)(a) codifies the Williams rule, and lists several purposes *1103 for which such evidence is admissible, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Id. The list is not exclusive. Id. (citing Ehrhardt, Florida Evidence § 404.9 (2d Ed.1984)).
The Mitchell court went on to hold that the evidence was admissible. The testimony regarding mistreatment of other residents, and testimony regarding the general conditions of the facility, including roach infestation, failure to follow nutritional guidelines, and lack of staff training, was admissible to show knowledge and absence of mistake on the part of the defendant, who claimed that the conditions relating specifically to the named victims were isolated instances beyond the defendant's knowledge and control. Similarly, the court held that evidence regarding the Iowa facility was admissible. A registered nurse who was a record keeper for the Iowa State Department of Health was permitted to introduce records showing that the defendant operated a similar facility in Iowa, and that, shortly before the defendant opened the Florida facility, Iowa denied him a license renewal based on numerous complaints similar to those made regarding the Florida facility. The court stated that the evidence was relevant to show that the defendant had a special reason to have had his attention drawn to the day-to-day management and care of the residents of the Florida facility, and that he was therefore knowledgeable of the conditions at the Florida facility.
In the instant case, Martin argues that the complaint filed by the estate was relevant to her claim for punitive damages and showed the "conscious indifference" of the center. The complaint filed by the estate, however, was filed after Martin was discharged, so it could not have been relevant to show that the center "had a special reason to have had it attention drawn to the day-to-day management and care of" its patients. It did not impeach the testimony of Long Term's president, who testified at trial via deposition that he did not know how many times Long Term had been sued in connection with the care it provided. Furthermore, under section 90.403, Florida Statutes, any relevance the complaint might have had was outweighed by the unfair prejudice against the center. The complaint contained bare allegations against the center in the form of rank hearsay.
REVERSED and REMANDED.
HARRIS, J., and SILVERNAIL, J.P., Associate Judge, concur.